# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————

Argued November 4, 2025        Decided August 4, 2026

No. 24-5297

JOSEPH PAUL ENGLEHARDT AND YVONNE DORA WADE,
APPELLANTS

v.

TODD BLANCHE, IN HIS OFFICIAL CAPACITY AS ACTING
ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA
AND UNITED STATES DEPARTMENT OF JUSTICE,
APPELLEES

—————

Appeal from the United States District Court
for the District of Columbia
(No. 1:24-cv-01865)

—————

*Amanda S. Berman* argued the cause for appellants. With her on the briefs was *Daniel W. Wolff*.

*Baruch Weiss*, *Allon Kedem*, and *Samuel F. Callahan* were on the brief for amici curiae Former Members of Congress in support of appellants.

*Joshua M. Koppel*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brett A. Shumate*, Assistant Attorney General, and *Sharon Swingle*, Attorney.

Before: RAO and WALKER, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

RAO, *Circuit Judge*: This is a case about which criminal proceeds must be deposited into the United States Victims of State Sponsored Terrorism Fund (the "Fund"). When the Department of Justice collected over $629 million in criminal penalties and forfeitures for conspiracies involving North Korea, the Department allocated only a fraction of those proceeds to the Fund. Two victims of state sponsored terrorism who hold claims against the Fund sued, alleging that all of these proceeds belonged in the Fund. The district court entered summary judgment for the Department.

We hold that the Department erred in its allocation and that the Justice for United States Victims of State Sponsored Terrorism Act requires that these criminal proceeds be deposited into the Fund. *See* 34 U.S.C. § 20144(e)(2)(A)(i). We therefore reverse and remand with instructions that summary judgment be entered for the plaintiffs.

## I.

### A.

Victims of state sponsored terrorism have long struggled to obtain redress from foreign states. Under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), federal courts have jurisdiction over damages suits for acts of terrorism by state sponsors of terrorism. 28 U.S.C. § 1605A. These states, however, often lack assets in the United States.

Recognizing the slim prospect of recovering damages from state sponsors of terrorism, Congress created the Fund.

*See* Justice for United States Victims of State Sponsored Terrorism Act, Pub. L. No. 114-113, div. O, tit. IV, § 404, 129 Stat. 2242, 3007 (2015) (codified as amended at 34 U.S.C. § 20144) ("VSST Act"). Victims holding final judgments against a state sponsor of terrorism for acts of terrorism under the FSIA's terrorism exception are eligible for compensation from the Fund. 34 U.S.C. § 20144(c) (defining the scope and timing of "eligible claims"). The Fund is administered by a special master, appointed by the Attorney General, who provides payments to eligible claimants on a generally pro rata basis. *Id.* § 20144(b), (d).

The Fund is financed with the penalties and forfeitures imposed for certain criminal offenses:

> All funds, and the net proceeds from the sale of property, forfeited or paid to the United States after December 18, 2015, as a criminal penalty or fine arising from a violation of any license, order, regulation, or prohibition issued under the International Emergency Economic Powers Act [("IEEPA")] or the Trading with the Enemy Act [("TWEA")], or any related criminal conspiracy, scheme, or other Federal offense *arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism*.[1]

---

[1] A parallel provision specifies that penalties and forfeitures from covered civil offenses must also be deposited into the Fund. *See* 34 U.S.C. § 20144(e)(2)(A)(ii).

4

*Id.* § 20144(e)(2)(A)(i) (internal citations omitted) (emphasis added) ("Funding Provision"). This case turns on a dispute over how to interpret this statute.

B.

In April 2023, British American Tobacco P.L.C. and its subsidiary, British-American Tobacco Marketing (Singapore) Private Limited, (collectively "BAT") agreed to pay more than $629 million in criminal penalties and forfeitures based on two conspiracy charges pertaining to illicit business with North Korean entities.

First, BAT was charged with conspiracy to evade sanctions issued under IEEPA against North Korean state-owned banks. *See* 50 U.S.C. § 1705(a) (IEEPA conspiracy). The North Korean bank Korea Kwangson Banking Corporation ("KKBC") was under sanctions that prohibited U.S. persons from transacting with or for the benefit of the bank. *See* Designation of an Entity Pursuant to Executive Order 13382, 74 Fed. Reg. 41782 (Aug. 18, 2009). BAT conspired to deceive U.S. financial institutions into processing payments for the benefit of KKBC, as well as other North Korean entities later subject to IEEPA sanctions. The IEEPA conspiracy ran from August 2009 to June 2017.

Second, BAT was charged with bank fraud conspiracy for conspiring to deceive U.S. financial institutions into processing transactions involving North Korea by falsely representing it had sold off its interest in the North Korean tobacco industry, even as it continued to profit from operations in the country. *See* 18 U.S.C. §§ 1344, 1349 (bank fraud conspiracy). During this conspiracy, North Korea was subject to IEEPA and TWEA sanctions that barred U.S. financial institutions from processing transactions beneficial to North Korea. Because BAT concealed its connection to North Korea, U.S. financial

institutions facilitated hundreds of millions of dollars in transactions that they otherwise would have rejected. The bank fraud conspiracy ran from at least August 2007 to June 2017.

BAT agreed to pay criminal penalties and forfeitures resulting from its IEEPA and bank fraud conspiracy charges.[2] It satisfied its obligations to the United States with a payment of approximately $653 million, which included penalties, forfeiture charges, and interest.

The Department determined that only a small portion of the BAT proceeds should be deposited into the Fund.[3] The Department followed its longstanding position that only proceeds arising from criminal offenses with a nexus to a state sponsor of terrorism must be deposited into the Fund. In other words, the Funding Provision's final qualifying phrase— "arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism"—applied to all listed offenses in the Funding Provision. 34 U.S.C. § 20144(e)(2)(A)(i).

Applying that interpretation to the BAT proceeds, the Department concluded that none of the proceeds from the IEEPA conspiracy should go into the Fund. The IEEPA conspiracy began in August 2009, but North Korea's status as a state sponsor of terrorism had been rescinded in October 2008. Rescission of Determination Regarding North Korea, 73 Fed. Reg. 63540 (Oct. 24, 2008). On the Department's view,

---

[2] British American Tobacco P.L.C. entered into a deferred prosecution agreement, and British-American Tobacco Marketing (Singapore) Private Limited pleaded guilty to the charges.

[3] We use the term "proceeds" to refer to all money payable to the Fund, whether through penalty, forfeiture, or fine, for a covered criminal offense.

the IEEPA conspiracy did not "aris[e] from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism."

The Department next decided that only a small share of proceeds from the bank fraud conspiracy qualified for deposit into the Fund. The Department treated the conspiracy as a series of transactions and allocated only those proceeds that arose from transactions that occurred while North Korea was designated as a state sponsor of terrorism. Although the bank fraud conspiracy lasted from at least August 2007 to June 2017, the state sponsor of terrorism designation was in place only until October 2008. The Department calculated that the period when North Korea was designated accounted for only 8.6 percent of the criminal transactions during the conspiracy, and so it deposited only that share of proceeds (around $11 million) into the Fund.

## C.

Joseph Paul Englehardt and Yvonne Dora Wade are victims of two terrorist attacks against the U.S. Embassy in Beirut by Hezbollah, a terrorist organization supported by Iran. Englehardt was injured in the 1983 bombing of the Embassy while he served in the U.S. Army. Wade was a civilian employee injured in the 1984 bombing of the Embassy Annex. Englehardt and Wade obtained judgments for money damages against Iran under the FSIA's terrorism exception. Each made claims for compensation from the Fund, and the special master concluded they were eligible victims in September 2022. Thus far, Englehardt and Wade have yet to receive the value of their outstanding claims from the Fund, because victims' claims have dwarfed the available proceeds. Appellants' Br. 10–11; VSST Fund, Payment Calculation Explanation for Non-9/11-

Related Claims Sixth Distribution (Dec. 2025), https://perma.cc/66WD-X8GM.

Englehardt and Wade challenged the Department's allocation of the BAT proceeds under the Administrative Procedure Act, arguing the Funding Provision required all BAT proceeds to be deposited into the Fund.[4] The district court granted summary judgment for the Department. It upheld the Department's interpretation of the Funding Provision and concluded that the allocation of the BAT proceeds was consistent with statutory requirements.

The plaintiffs appeal, and we review the district court's grant of summary judgment de novo. *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 17 (D.C. Cir. 2022).

II.

Plaintiffs challenge the Department's allocation of the BAT proceeds as contrary to the Funding Provision. We begin with the threshold dispute between the parties, namely which offenses in the Funding Provision must have a nexus to a state

---

[4] At the time the plaintiffs filed suit, the Department had not yet determined whether to deposit any of the BAT proceeds into the Fund. The plaintiffs initially claimed that the Department had unreasonably delayed deposit of the proceeds, but they concede this claim is now moot. *See* 5 U.S.C. § 706(1). Separately, the district court dismissed the plaintiffs' request for a declaratory judgment. The Declaratory Judgment Act does not provide an independent cause of action, so the plaintiffs' request for declaratory relief rises or falls with their APA claim. *See Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011).

sponsor of terrorism such that the proceeds from those offenses must be deposited into the Fund.

## A.

Congress channeled the proceeds from certain criminal offenses into the Fund. To determine which offenses must have a nexus to a state sponsor of terrorism, we start with the Funding Provision's text:

> All funds, and the net proceeds from the sale of property, forfeited or paid to the United States after December 18, 2015, as a criminal penalty or fine arising from a violation of any license, order, regulation, or prohibition issued under [IEEPA] or [TWEA], or any related criminal conspiracy, scheme, or other Federal offense arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism.

34 U.S.C. § 20144(e)(2)(A)(i) (internal citations omitted).

The parties dispute which listed offenses must have a nexus to a state sponsor of terrorism. The Department maintains that every offense in the Provision—violations of IEEPA, TWEA, and related conspiracies, schemes, and other Federal offenses—must have such a nexus. The plaintiffs argue that only "other Federal offense[s]" require a nexus to a state sponsor of terrorism.

We conclude that neither of these interpretations reflects the best meaning of the statute. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2265–66 (2024) (reaffirming that courts must exercise "independent judgment" and employ "the

traditional tools of statutory construction" to discern the "single, best meaning" of the statute).

To begin with, the Funding Provision reads most naturally as identifying two categories of proceeds that must be deposited into the Fund, those that arise from: (1) "a violation of any license, order, regulation, or prohibition issued under" IEEPA or TWEA; (2) "or any related criminal conspiracy, scheme, or other Federal offense arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism." The Provision's text and grammatical structure establish this two-part division. A comma and disjunctive "or" separate each category of offenses. The first category is a separate clause that includes proceeds from violations of orders issued under IEEPA or TWEA. The second category begins with the prepositive modifier "related," a term that both parties rightly agree extends to "criminal conspiracy, scheme, or other Federal offense." The grammatical structure reinforces that there are two categories of offenses.

Given the Funding Provision's text and internal structure, the state sponsor of terrorism requirement qualifies the entire list of offenses in the second category, "any related criminal conspiracy, scheme, or other Federal offense." A modifier may apply to a list of terms when Congress has employed a "straightforward, parallel construction that involves all nouns or verbs in a series." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021) (cleaned up). Here, the second category is a list of parallel offenses, all of which must be "related" to an IEEPA or TWEA violation. The state sponsor of terrorism qualifier immediately follows this list of offenses without any offsetting comma or other punctuation. The qualifying phrase "is applicable as much to the first as to the last words in [the] list," and the offenses "form a single, integrated list." *Lockhart v. United States*, 577 U.S. 347, 355–56 (2016) (cleaned up).

Context confirms that the state sponsor of terrorism qualifier applies to the entire list of offenses in the second category.

For similar reasons, however, the requirement of a nexus to a state sponsor of terrorism does not extend to the first category of offenses under IEEPA and TWEA. As already discussed, the Funding Provision has two distinct categories of offenses. The state sponsor of terrorism qualifier applies to the entire second category, but it does not naturally extend back to the first category of IEEPA and TWEA violations. When faced with a similarly structured statutory provision, we applied the relevant "limitation … only to the antecedent group and not to others" that were "more remote" because Congress separated them with a "disjunctive 'or.'" *United States v. Pritchett*, 470 F.2d 455, 458–60 (D.C. Cir. 1972). Looking to the "plain wording of the statute" and "context," we concluded the separation marked Congress's treatment of each group as a "separate class." *Id.* at 456, 459–61. Here too, the text and context indicate the state sponsor of terrorism qualifier applies only to the immediately antecedent "separate class" of offenses, namely "any related criminal conspiracy, scheme, or other Federal offense." Congress separated the categories with a disjunctive "or" and set off the second category with the prepositive modifier "related." This grammatical structure supports our interpretation that the Funding Provision sets out two distinct categories of offenses and that the state sponsor of terrorism qualifier applies only to the second.

The Funding Provision therefore sweeps all proceeds from the relatively fixed set of IEEPA and TWEA violations into the Fund, while limiting the more capacious category of proceeds from related offenses to only those offenses that have a nexus to a state sponsor of terrorism.

11

B.

We find the alternative interpretations advanced by the plaintiffs and the Department unpersuasive because they cannot be reconciled with the text and grammatical structure of the Funding Provision.

Plaintiffs maintain the state sponsor of terrorism qualifier extends exclusively to "other Federal offense." They rely on the last antecedent rule, which limits the application of a qualifying clause to what it "immediately follows." *Lockhart*, 577 U.S. at 351 (cleaned up). But like all general rules of language, the last antecedent rule depends on context and is "not inexorable." *United States v. Little*, 78 F.4th 453, 456 (D.C. Cir. 2023). The Supreme Court has repeatedly cautioned against mechanically applying the last antecedent rule where, as here, a "modifying clause appears at the end of a single, integrated list." *Lockhart*, 577 U.S. at 355 (cleaned up). Plaintiffs' interpretation is at odds with ordinary grammar because the state sponsor of terrorism qualifier follows an integrated list, "any related criminal conspiracy, scheme, or other Federal offense." Moreover, we see nothing in the context of the Funding Provision to support the conclusion that the state sponsor of terrorism qualifier should attach only to the last item of the integrated list.

Taking a different approach, the Department contends that a nexus to a state sponsor of terrorism is required for all offenses listed in the Funding Provision. The Department's overarching argument emphasizes that because the Fund compensates victims of state sponsored terrorism, money channeled into the Fund should be linked to criminal offenses with a nexus to a state sponsor of terrorism. According to the Department, Congress could not have intended to funnel the billions in proceeds collected each year from IEEPA violations

into the Fund, irrespective of any connection to state sponsored terrorism. The Department highlights that such proceeds otherwise would be deposited into different funds that compensate broader classes of victims, which it maintains is a more reasonable allocation. But Congress struck a different balance in the Funding Provision, and our obligation is to follow the law, not impose an allocation the government finds more reasonable.

Looking beyond the Funding Provision, the Department points to other provisions in the VSST Act that demonstrate the Fund is for the benefit of victims of state sponsored terrorism and to two specialized provisions linking funding with state sponsors of terrorism.[5] According to the Department, these distinct statutory requirements imply that all proceeds deposited into the Fund must stem from a state sponsor of terrorism. But these provisions unremarkably demonstrate Congress's concern with victims of state sponsored terrorism in a statute that assists victims of state sponsored terrorism. They reflect the general purposes of the statute but do not inexorably lead to the conclusion that Congress chose to compensate these victims only with proceeds from offenses linked to state sponsors of terrorism. These scattered statutory provisions cannot justify the Department's attempt to superimpose a state sponsor of terrorism requirement where Congress did not provide for one.

---

[5] *See* 34 U.S.C. § 20144(e)(2)(B) (channeling proceeds from two then-pending proceedings involving Iran into the Fund and allowing certain individuals with judgments in those proceedings to elect to participate in the Fund in exchange for assigning any interest in the proceeds from those proceedings to the United States); *id.* § 20144(g) (providing an award to eligible claimants who notify the Attorney General of funds or property held by a state sponsor of terrorism that are ultimately forfeited to the United States).

The Department also maintains that its interpretation of the Funding Provision is longstanding, and Congress ratified that interpretation when it revised the statute in 2019 but left the Funding Provision's state sponsor of terrorism qualifier unchanged. Of course, "the fact that [a] practice is longstanding cannot render it lawful." *Env't Def. Fund v. EPA*, 124 F.4th 1, 18 (D.C. Cir. 2024).

As for Congress's purported ratification, the Department's argument fails for at least two reasons. First, "[w]here the law is plain, subsequent reenactment does not constitute an adoption of a previous administrative construction." *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991). Congress's 2019 amendment does not disturb the "plain" scope of the state sponsor of terrorism qualifier. Second, when there is "no … evidence to suggest that Congress was even aware of" an agency's "interpretive position," legislative reenactment is "without significance." *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (cleaned up). The Department highlights isolated reports and internal documents drafted before the reenactment that reflect its preferred interpretation. *See, e.g.*, VSST Fund, *Report from the Special Master* 1 (Jan. 2017), https://perma.cc/PUF4-KT6B (explaining in a single sentence overviewing the Fund that "funds are to come from civil and criminal matters involving prohibited transactions with state sponsors of terrorism"). Yet the Department points to no evidence Congress ratified this construction of the state sponsor of terrorism qualifier. The Department simply fails to show a "uniform weight of authority" that might justify applying the reenactment canon. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 323 (2012).

As is often the case when attempting to infer meaning from legislative inaction, we simply have no idea whether Congress

acquiesced in, or was even aware of, the Department's interpretation. The Department's reconstruction of congressional intent cannot overcome the plain meaning of the Funding Provision that Congress enacted.

\* \* \*

In sum, the state sponsor of terrorism qualifier applies to "any related criminal conspiracy, scheme, or other Federal offense," but not to IEEPA and TWEA violations. Proceeds from IEEPA and TWEA violations must be deposited into the Fund, irrespective of whether those violations have a nexus to a state sponsor of terrorism. By contrast, proceeds from a "related criminal conspiracy, scheme, or other Federal offense" must go into the Fund only when the offense "aris[es] from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism."

## IV.

Having determined which offenses require a nexus to a state sponsor of terrorism, we next consider whether the Department's allocation of the BAT proceeds comports with the statute. To answer this question, we must further interpret the Funding Provision and apply it to the particular offenses charged against BAT.

## A.

First, BAT was charged with a conspiracy to violate the IEEPA sanctions on KKBC and other North Korean entities. IEEPA makes it "unlawful for a person to violate, attempt to violate, *conspire to violate*, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a) (emphasis added). The Funding Provision mirrors this language, requiring the deposit of proceeds that

15

"aris[e] from a violation of any license, order, regulation, or prohibition issued under [IEEPA]." 34 U.S.C. § 20144(e)(2)(A)(i). The conspiracy to violate IEEPA sanctions was charged under IEEPA (section 1705(a)) and therefore is a violation of IEEPA that falls within the first category of offenses in the Funding Provision.

We disagree with the Department's assertion that this IEEPA conspiracy is only a conspiracy "related" to IEEPA and therefore must have a nexus to a state sponsor of terrorism. BAT was charged under section 1705(a) for violations of an IEEPA sanctions order. The IEEPA conspiracy commenced on or shortly after August 11, 2009, the date when the Department of Treasury sanctioned KKBC under Executive Order 13382, which was issued in part under IEEPA.[6] *See* 74 Fed. Reg. at 41782. The conspiracy is plainly "a violation of" an "order … issued under [IEEPA]." 34 U.S.C. § 20144(e)(2)(A)(i). Irrespective of any connection to a state sponsor of terrorism, all proceeds from BAT's IEEPA conspiracy must go into the Fund.

## B.

Second, we consider the proceeds from BAT's bank fraud conspiracy. We agree with the parties that the bank fraud conspiracy is "related" to sanctions issued under IEEPA and TWEA against North Korea.[7] It is therefore a "related criminal

---

[6] Executive Order 13382 prohibits not only direct transactions with the designated entities, but also "[a]ny conspiracy formed to violate the prohibitions set forth in [the] order." 70 Fed. Reg. 38567, 38568 (July 1, 2005).

[7] The record demonstrates that the charged bank fraud conspiracy was sufficiently connected to IEEPA and TWEA sanctions to qualify as a "related" criminal conspiracy eligible for deposit into the Fund. *See Related*, Black's Law Dictionary (12th ed. 2024) ("Connected in

conspiracy, scheme, or other Federal offense" and is subject to the state sponsor of terrorism qualifier. 34 U.S.C. § 20144(e)(2)(A)(i). Whether the proceeds from BAT's bank fraud conspiracy must go into the Fund hinges on what it means for a conspiracy to "aris[e] from … doing business with … a state sponsor of terrorism." *Id.*

The Department allocated the bank fraud proceeds by treating the conspiracy as a series of transactions and only depositing into the Fund proceeds from transactions that occurred while North Korea was designated as a state sponsor of terrorism. The conspiracy ran from at least 2007 to 2017, but North Korea's designation as a state sponsor of terrorism was rescinded in 2008. The Department allocated 8.6 percent of the bank fraud proceeds to the Fund, corresponding to the share of fraudulent transactions that occurred while North Korea was designated. The district court upheld the Department's transaction-focused construction, reasoning that the statute focuses on when the "defendant in the federal enforcement action 'd[id] business with' or 'act[ed] on behalf of'" the relevant state sponsor of terrorism. *Englehardt v. Garland*, 759 F. Supp. 3d 112, 119 (D.D.C. 2024) (quoting 34 U.S.C. § 20144(e)(2)(A)(i)). In the district court's view, even though a conspiracy is ongoing, only those proceeds tracing to "unlawful conduct" that occurred while the state was designated must be deposited into the Fund. *Id.* at 119–20.

---

some way; having relationship to or with something else"). BAT conspired to evade sanctions issued against North Korea under IEEPA and TWEA. BAT's bank fraud conspiracy caused U.S. financial institutions to process transactions on behalf of North Korean entities in violation of these same sanctions. The bank fraud conspiracy is therefore related to IEEPA and TWEA violations.

We disagree. When a conspiracy originates with a state sponsor of terrorism, the entire conspiracy "arises from" doing business with a state sponsor of terrorism and all of its proceeds must go into the Fund.

To begin with, the Funding Provision focuses on the proceeds from particular offenses, not individual transactions underlying those offenses. The second category of the Provision covers a "related criminal conspiracy, scheme, or other Federal offense." Both "criminal conspiracy" and "other Federal offense" refer to a singular offense, rather than any transactions that might underlie the offense. *Cf. Iannelli v. United States*, 420 U.S. 770, 777 (1975) ("Conspiracy is an inchoate *offense*, the essence of which is an agreement to commit an unlawful act.") (emphasis added). Conspiracy carries with it a rich common law history, and "basic principles of statutory construction require us to assume that Congress meant to incorporate the cluster of ideas attached to the common-law term it adopted." *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 103 (2011) (cleaned up). That a conspiracy may be ongoing is fundamental to the cluster of ideas attached to a conspiracy. *Cf. United States v. Kissel*, 218 U.S. 601, 608 (1910) (observing that conspiracy "may have continuation in time"). A conspiracy is a single offense that may encompass multiple unlawful transactions, but the Funding Provision does not refer to unlawful acts or transactions. When the "related" offense is a conspiracy, we must consider whether that singular offense has a nexus to a state sponsor of terrorism, not whether the transactions undertaken as part of the conspiracy have such a nexus.

The surrounding context in the VSST Act also supports this interpretation, because other provisions of the statute turn on "acts" of terrorism. For instance, to recover from the Fund, claimants must hold "a final judgment" that was

"issued … against a foreign state that was designated as a state sponsor of terrorism at the time the acts [of international terrorism] occurred or was so designated as a result of such acts." 34 U.S.C. § 20144(c)(2)(A)(i). By contrast, the Funding Provision does not refer to criminal "acts," let alone "transactions." This meaningful variation between two neighboring statutory provisions supports an interpretation that distinguishes a criminal "offense" from a transaction or act involving a state sponsor of terrorism. *See Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2071 (2018) (recognizing presumption that "differences in language … convey differences in meaning") (cleaned up). In the Funding Provision, Congress specified that proceeds from certain "offense[s]"—namely related conspiracies, schemes, or other Federal offenses—must be deposited into the Fund.

Applying this interpretation to BAT's bank fraud conspiracy, the proceeds from that conspiracy belong in the Fund if the conspiracy offense "*ar[ose] from* the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism." 34 U.S.C. § 20144(e)(2)(A)(i) (emphasis added). In surveying case law interpreting similar statutory language, we have concluded that the "ordinary understanding" of "arising from" is to "originate or stem from." *N. Am. Butterfly Assoc. v. Wolf*, 977 F.3d 1244, 1260 (D.C. Cir. 2020) (cleaned up). The phrase simply "requires a causal connection." *Id.* Something "arises from" an action when it originates or comes into being due to that action. *Arise*, Black's Law Dictionary (12th ed. 2024) ("To originate; to stem (from)"); *see also Arise*, The Oxford English Dictionary (2d ed. 1989) ("To spring, originate, or result *from*").

The bank fraud conspiracy has the requisite nexus to a state sponsor of terrorism because the conspiracy stemmed from BAT's business relationship with North Korean state-

owned entities while the country was a designated state sponsor of terrorism. The causal connection is clear: but for BAT's business arrangement with those entities there would be no criminal bank fraud conspiracy in 2007.[8] The conspiracy "originated" or "stemmed" from doing business with North Korea while it was a state sponsor of terrorism. And the conspiracy continued after the designation was rescinded. *See Kissel*, 218 U.S. at 607 (explaining that a conspiracy to "bring[] to pass a continuous result" is a single conspiracy, not "a cinematographic series of distinct conspiracies"). BAT's bank fraud conspiracy was a single offense that arose from doing business with a state sponsor of terrorism. Therefore, all proceeds from the bank fraud conspiracy must be deposited into the Fund.

Finally, we reject the Department's various policy arguments in favor of its transaction-based approach. The Department contends that an offense-based interpretation produces absurd results because Congress could not have intended to capture proceeds from a criminal conspiracy that continues after a state sponsor of terrorism designation is rescinded. We doubt this result is absurd, and in any event we cannot override the plain meaning of the Funding Provision to promote the Department's preferred results. *See Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 642 (7th Cir. 2012) (recognizing absurdity doctrine does not empower judges to make "substantive changes designed to make the law 'better'" when presented with statute that "can be applied as written").

---

[8] The charging documents state the bank fraud conspiracy commenced "in at least August 2007" and suggest the conspiracy may have started earlier. J.A. 145; *see* J.A. 72–75. In any event, there is no dispute that North Korea was designated as a state sponsor of terrorism when the conspiracy began.

If the Department favors a different allocation of proceeds for policy reasons, it may of course direct its concerns to Congress.

The Department also argues an offense-based interpretation would allow funding determinations to turn on a prosecutor's charging decisions, an outcome that Congress could not have intended. It is true that conspiracies are often made up of distinct criminal offenses, so a prosecutor's choice to charge separate criminal violations, as opposed to a single conspiracy, could impact which proceeds must be deposited into the Fund. Such prosecutorial discretion, however, is simply a feature of our constitutional system, and charging decisions may have a range of collateral consequences across our voluminous federal laws. The Department finds such an outcome untenable, but it is consistent with the Funding Provision that Congress enacted.

BAT's bank fraud conspiracy stemmed from its business relationship with North Korean entities when North Korea was designated as a state sponsor of terrorism. Because the bank fraud conspiracy "ar[ose] from … doing business with a state sponsor of terrorism," all proceeds from the conspiracy must be deposited into the Fund.

\* \* \*

For the foregoing reasons, all proceeds from BAT's IEEPA and bank fraud conspiracies must be deposited into the Fund. We accordingly reverse the district court's judgment and remand with instructions to enter summary judgment for Englehardt and Wade.

*So ordered.*